UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

Islamic Sunni Ummah, et al.

vs. C.A.No. 08-094 ML

Ashbel T. Wall, et al.

**MEMORANDUM OF LAW IN OPPOSITION**

**DEFENDANTS' MOTION TO DISMISS**

**INTRODUCTION**

On, 3/13/2008, Plaintiffs filed a Class Action Civil Complaint in the United States District Court for the District of Rhode Island, alleging violations of their First, Eight, and Fourteenth Amendment rights, by the Defendants, acting under color of law. The Defendants have subsequently filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). The Defendants' grounds for seeking a dismissal will be adressed in the order in which they appear.

**ARGUMENT**

**A. Rule 12(b)(6), 56(c), and 8(a) Standards.**

Although the legal standard for reviewing a motion under Rule 12(b)(6) remains constant, the degree of specificity with which the operative facts must be stated in the pleadings varies depending on the case's context.United States v. AVX Corp., 962 F.2d 108, 115 (1st Cir. 1992). A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Conley v. Gibson, 355 U.S. 41, 45-47 (1957).

The Defendants have opined that the Plaintiffs' complaint

is nothing more than baseless accusations with no fact to support, and that the "reviewing court is obliged neither to credit bald assertions, periphrastic circumlocutions, unsubtantiated conclusions [...etc.]."United States v. AVX Corp, id..

The Plaintiffs assert that even a cursory reading of the Complaint, in addition to the ten signed affidavits in support, would leave a reviewing court with a prima facie showing that subtantial Civil Rights violations are taking place at the Adult Correctional Institution, that the Defendants know about these violations, and that they are the ones who have caused them or allow them to continue with complete indifference to the actions of their subordinates.

In considering a dismissal, a reviewing court must assume that every fact stated within the complaint is absolutely true. It must be asked whether, accepting all those facts, there is any possibility that the Plaintiff could win the case on any theory. If any combination of the facts stated in the complaint might qualify the Plaintiff for any form of court action under §1983, the the reviewing court is legally required to deny the prison officials' motion to dismiss the complaint.Cruz v. Beto, 405 U.S. 319, 322 (1972).(In this prisoner §1983 case, the court stated that a complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief.");Conley v. Gibson, 355 U.S. 41, 45-46 (1957) (The Supreme Court stated that in considering a motion to dismiss, a pro se complaint should be held to less strict standards than a motion drafted by a lawyer).

To win on a summary judgement, the prison officials have to prove to the reviewing court that "there is no genuine issue as to any material fact and that [defendants] are entitled to judgement as a matter of law." Fed.R.Civ.P. 56(c). Essentially if there's a dispute in the facts that makes a difference in the case, the court must deny summary judgement. Wilson v. Williams, 997 F.2d 348, 350-51 (7th Cir. 1993). A genuine issue exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Matushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1996); see: Smith v. Maschner, 899 F.2d 940,949 (10th Cir. 1990) (Circumstantial evidence could create an issue of meterial fact barring summary judgemnt).

The Defendants cannot simply rest on conclusory legal claims when the Plaintiffs have submitted affidavits and documents countering those naked allegations. Wilson v. City of Chicago, 707 F.Supp. 379, 381-82, (N.D.Ill.1989)-(Summary judgement could not be granted to a police supervisor whose conduct permitted the inference that he condoned or encouraged excessive force).

If a complaint is verified, as is the current one in question, the court should consider it as an affidavit in opposition to summary judgement. Neal v. Kelly, 963 F.2d 453, 457 (D.C.Cir. 1992). A court cannot decide matters outside the complaint without formally converting the motion to one for summary judgement and giving the Plaintiff notice and a chance to respond.

Failure to state a claim upon which relief can be granted means that even if all the facts the Plaintiffs' allege are true, they don't establish a violation of the constitution or

of any other law that the court can enforce. The Plaintiffs have appended to this memorandum a sworn declaration which further defines each individual Defendant's actions that led to the violations of Plaintiffs' rights. This declaration, in addition to the Complaint adequately meet the standard of Rule 8(a). Under Haines v. Kerner, 404 U.S. 519, a pro se litigant must be held to less stringent standards. The Plaintiffs have done everything they possibly can to state a claim and establish the facts, and we cannot be held responsible for our novice inability to meet the professional standards of a lawyer.

1. Defendants' Culpability.

Rhode Island General Law 42-56-10.Powers of the Director.- States the following:

"In addition to exercising the powers and performing the duties, which are otherwise given to him or her by law, the director of the department of corrections shall:

[...](3) Establish and enforce standards for all state correctional facilities;

(4) Supervise and/or approve the administration by the assistant director of the department;

[...](6) Direct employees in the performance of their official duties;

[...](9)Determine the methods,means,and personnel by which those operations of the department are to be conducted;

[...](15) Investigate grievances and inquire into alleged misconduct within the department;

[...](22) Make and promulgate the necessary rules and regulations incident to the exercise of his or her powers and the performance of his or her duties, including, but not limited to, rules and regulations regarding nutrition, sanitation, safety, discipline, recreation, religous services, communication, and visiting priviledges, classification, education, training, employment, care, and custody for all persons commited to

correctonal facilities.

The Director's responsibility under the law is unequivocal. It cannot be argued that the law vests the sole responsibility upon the Director to protect the rights of the inmate population, investigate misconduct on the parts of his subordinates, and supervise and direct correction's employees.Ferola v. Moran, 622 F.Supp. 814 (D.R.I.1985)(Since all policies, practices, and administrative procedures are set by and under the control of the Director of Corrections, and since he set no policies to safeguard inmates against unconstitutional conduct on the part of his subordinates, he had to be held responsible).

The foregoing is clear evidence that any misconduct on the part of correction's employees, including the deprivation of protected rights, is the responsibility of the Director. Rhode Island General Law 42-56-5 states the following:

**Director to be appointing authority.-The director of the department of corrections, subject to the provisions of chapter 4 of title 36, shall be the appointing authority for all employees of the department, and he or she may assign this function to thos those subordinate officers and employees that may to him or her seem feasible or desirable. Not withstanding any law to the contrary, the director shall appoint the assistant directors in charge of the divisions of the department created pursuant to §42-56-4, as amended. The assistant director, institution/ operations, the assistant director, rehabilatative services, and the assistant director, administration, shall be in the unclassified service, shall serve at the pleasure of the director, and shall be subject to the authority and supervision of the director who may assign to them those tasks and functions that the director deems appropriate in order to ensure the proper management and administration of the departmet.**

Defendant Ashbel T. Wall is the Director of the Rhode Island Department of Corrections. He is legally responsible for the overall operation of the Department and each institution under its jurisdiction, including the Maximum Security Facility, where the majority of the civil rights violations in the complaint took place, and continue to take place to this day.

Defendant Wall's subordinate, James Weeden is the Warden of the Maximum Security Facility. Warden Weeden is the individual, along with his Deputy, Matthew Kettle, who gave the specific orders that the Sunni Muslims were not to pray in congregation or alone, outside of their cells. As is evidenced within this complaint, Defendant Wall was informed that Warden Weeden was not allowing Muslim inmates to pray outside of their cells, and likewise, he ordered that Muslim inmates could not wear thier religous Kufis, outside of the cell. Warden Weeden is legally responsible for the operation of the Maximum Security Facility, and for the welfare of all of the inmates of the prison.

Defendant Matthew Kettle is the Deputy Warden of the Maximum Security Facility. He is responsible for the overall operations of the facility, in conjunction with the facility Warden. Defendant Kettle, along with Warden Weeden, has prevented the Sunni Muslim population from praying outside of their cells, wearing their religous head dress (kufi), and congregating for study in the reading library.

Defendant Roberta Richman is the Assistant Director of Programs for the Rhode Island Department of Corrections. She is assigned to the oversight of each institution under the jurisdiction of the RIDOC, including the Maximum Security Facility, and within the overall oversight of the capacities of her

postion. She is responsible for the implementation of the various provisions of the Rhode Island Department of Correction's Religous Programs Policy (DOC 26.01). This includes the various policy provisions that the Plaintiffs' contest, including access to the prison mosque, congregational prayer, wearing of religous dress, and consumption of a religous diet. It is claimed that Director Richman was negligent, careless, and indifferent to protecting the rights of the Sunni Muslim population in failing to implement the various provisions of the Department of Corrections Religous Programs Policy.

Defendant John Rogers is the Director of the Rhode Island Department of Corrections Food Services. He is assigned to the oversight of all the food services provided to the inmate population at the Department of Correction, including the policy requirements that cover the issues of nutrition, preperation, and accomidation of religous diets. It is claimed that Director Rogers was negligent, careless, and indifferent to protecting the rights of the Sunni Muslim population in failing to implement the various provisions of the Department of Correction's Religous Programs Policy, Diet Policy, and Menu Policy.

All of the above named Defendants are in fact systematically depriving all Muslim inmates of their First Amendment rights of Freedom of Expression and Free Exercise of Religon. As evidenced in the complaint and the various appendicies, there is undisputable evidence that the above named Defendants knew what their responsibilities were under the law, they knew that they had a duty to protect the civil and legal rights of the offender population, but yet they completely failed to act.

Correctional supervisors may be held liable for failing to

correct unconstitutional conditions of confinement or other violations within their area of responsibility if they knew or should have known about them. Knowledge that an incident happened is enough to support supervisor liability; the supervisor must have knowledge of the facts suggesting a violation of law. Kind v. Cuyler, 541 F.Supp. 1230, 1234 (E.D.Pa. 1962).

Officials may be held liable for failure to make policy or to take action to prevent predictable violations of rights within their areas of responsibility. Meriwether v. Coughlin, 879 F.2d 1037 (2d. Cir. 1989); Bolin v. Black, 875 F.2d at 1242-1246; Roland v. Johnson, 856 F.2d 764 (6th Cir. 1988);Bryant v. McGinnis, 463 F.Supp. 373, 387 (W.D.N.Y. 1978)-**Commisioner could be held liable for failure to promulgate regulations protecting Muslims' rights of religous practice.**

Aside from the failure of the Defendants to properly implement various Department of Corrections policies which seek to protect the constitutional rights of the offender population; the Defendants also failed to promulgate rules and regulations that specifically deal with the various religous practices with which Muslim inmates partake.In fact, this issue remained silent for decades. At no time,in the history of this institution,has the Sunni Muslim population ever had such problems as praying and congregating for relgous study. Until the recent years, the Department, and the Defendants, never sought to prevent the Sunni Muslim population from exercising their religous rights to pray and congregate. Only over the past few years has the Department (i.e. Defendants) sought to limit the exercise of the Plaintiffs' religon. Consequently, injunctive

relief is sought against these named Defendants in particular because they are the ones who have either directly prohibited the Plaintiffs' from execising their religon, or they are the only persons within the Department of Corrections who have the ability to end the constitutional violations if so ordered. Luckey v. Harris, 860 F.2d 1012, 1015-16 (11th Cir. 1988), cert. denied, 110 S.Ct.2562 (1990).

The Deparment of Corrections Code of Ethics Policy (3.14-1) clearly states that corrections staff shall protect the civil and legal rights of all membersof the inmate population. The named Defendants cannot claim that they did not know what their repsonsibilities were to protect the civil and legal rights of the offender population, including the Sunni Muslim inmates. As evidenced in the complaint and attached declaration, Defendants knew, or should have known that various constitutional violations were taking place against the Muslim inmate population.

All of the Defendants' actions were clearly motivated by a deliberate indifference to the Plainfiffs rights, as the Federal and State Laws in this matter are clearly established, as well as the applicative Federal and State Court rulings, and the Department of Corrections own policy. In fact, the Director of Correction's signature is affixed to the heading of all policy sections. Ignorance can not be claimed in this matter as the law and policies are clearly known and established. This constitutes a reckless and callous indifference to the Plaintiffs' rights.

Each of the named Defendants in their official capacites carried out a policy or practice that led to the violations of

the Plaintiffs' rights. At the time of the various contitutional violations that took place, and that are still taking place to this day, each of the Defendants was exercising the powers that come from his or her postions of authority. There is likewise no requirement of direct participation in a constitutional violation. See, e.g., Wright v. Smith, 21 F.3d 496, 501 (2d. Cir. 1994).

Throughout the complaint and attached declaration is replete evidence that each Defendant either 1. Directly participated in the violations of the Plaintiffs' rights. 2. Knew or learned of the violation of the Plaintiffs' rights and failed to do anything to fix the situation. 3. Created a policy or custom allowing or encouraging the illegal acts; or 4. Was grossly negligent in managing the people he or she was supposed to supervise. Fairley v. Luman, 281 F.3d 913, 918 (9th Cir. 2002)-Holding that city's failure to have procedures in place to verify warrants was an unwritten policy that deprived a man of his rights when he was mistakenly held on warrant for someone else.

Any failure on the part of the Plaintiffs' to state and adequate claim, or connect a factual predicate to the named Defendants for the constitutional violation is remidied by the attached declaration and references made herein.

**B. 42 U.S.C. § 1983, 1985, and 1986.**

Defendants' claim in their motion to dismiss that the facts of the complaint do not rise to the level a constitutional violation. This is an absolute absurdity. The named Defendants do not allow Muslims to pray outside of their cells, whether

alone, or in congregation; but, other religous groups are allowed to do quite the opposite. How can an identifiable class of people be denied the right to pray, while yet others are allowed to exercise the very same rights, and this does not rise to the level of a constitutional violation? Furthermore, it is undeniable that the Defendants' are not providing a religous meal that meets even the most basic guidelines of nutrition. Yet, other religous groups are provided with specially ordered dietary trays to accomidate their faith. All of this, in addition to the facts of the complaint and the attached declaration, clearly demonstrate a prima facie showing that the named Plaintiffs are in fact being deprived of the right to Free Exercise of Religon and Equal Protection of the laws.

When a prisoner claims that his religon has been singled out for unfair treatment as compared to other religons in the prison, a potential equal protection violation is raised. One of the first prison cases, Cruz v. Beto, 405 U.S. 319 (1972), involved such claim. In Cruz, the Plaintiff alleged that Buddhist inmates in the Texas penal system were not granted the same rights to practice as Christian prisoners. The Supreme Court held that every prisoner is entitled to a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religous precepts...." Thus, Courts have held that Muslim inmates who alleged that they were not permitted to receive religous diets, while Jewish inmates were, stated a claim under the Equal Protection Clause. Moorish Science Temple of America, Inc. v. Smith, 693 F.2d 987 (2d Cir. 1982).

Dietary meals are not the only issue the Plaintiffs' have raised as well. Christian religous groups are allowed to congregate, study and pray, and they are not told to stop, yet the Muslims are. Christians and Hindus are free to wear their religous decorum, but Muslims are not.

Eating Halal meat is obligatory in the Muslim religon; the Defendants' have denied the Plaintiffs the right to exercise this belief. Praying is obligatory in the Muslim religon; the Defendants' have denied the Plaintiffs' the right to exercise this belief. Congregating with other Muslims is obligatory; this has been denied. Wearing the religous kufi is obligatory; this has been denied. These, and all other claims within the complaint,demonstrate a clear violation of the Plaintiffs' rights to free exercise of religon. Furthermore, in violation of their own policy, Defendants' have not had a licensed dietician evaluate the food that the Plaintiffs' are being provided. Not only are the Defendants not providing meals that conform to the Plaintiffs' religous beliefs, but they're not even providing protein alternatives on a regular basis as they were required per Federal Court ruling (See, Appendix H of the Complaint).

Under 42 U.S.C. § 1985, the Plaintiffs are required to show that the Defendants conspired against Plaintiffs because of their membership in a class and that the criteria for defining the class are invidious.

As evidenced by the complaint and the attached declaration, the Defendants clearly are singling out the Sunni Muslim population over all other religions. Not even other Muslim sects

are being singled out; only the Sunni Muslims of Maximum Security.

All of the named Defendants knew that they had a responsibility to protect the civil and legal rights of the offender population, and that that likewise applied to the Sunni Muslim population. Warden Weeden was informed that Deputy Warden Kettle was not allowing Muslim inmates to pray outside of their cells, wear their kufis, or congregate for study; yet he failed to act to prevent the violation of the Plaintiffs' rights, and instead supported the decision and told the Plaintiffs the same.

Director Wall was then informed of Warden Weeden's denial of the Plaintiffs' free exercise of religon and he too fialed to act.

Assistant Director Richman knew that Muslim inmates were to be provided with a religous diet sufficient to maintain the prisoner in good health (See, Appx.H-Complaint), but yet failed to implement the Federal Court ruling, and instead turned a blind-eye to Faclility Managers (i.e. Warden Weeden and Deputy Warden Kettle) and left it to their discretion to implement the policy. In fact, the Muslim inmates of Maximum Security were never informed for almost a year that they were entitled to a protein alternative per Federal Court ruling. Yet, all other groups of Muslims in every other building other than Maximum Security, were informed of the matter and procedures were put in place in the other facilities to implement the Federal ruling. This was never the case with the Maximum Security Facility. Instead, the entire matter was kept under a closed lid.

The same applies to Assistant Director John Rogers who likewise communicated with facility managers and advised them on the Federal ruling, but yet did nothing when the Warden and the Deputy Warden failed to implement the provisions accordingly. Assistant Director Rogers, who was responsible for the implementation of the Federal ruling in all facilities, properly implemented the ruling in all facilities except for the Maximum Security facility, and instead left it to the Warden's and Deputy Warden's "discretion" to implement such procedure.

As evidenced in the complaint and declaration, a prima facie claim under 42 U.S.C. §§ 1985 and 1986 has been clearly shown. Even today, with all Defendants receiving a copy of this complaint, Defendants still continue to deprive Plaintiffs of their rights to free exercise of religon, and, in fact, have recently sought to impose even more restrictions since the filing of this complaint.

**C. First, Eight, and Fourteenth Amendment Claims.**

The Plaintiffs' claims under the respective statutes are as follows:

*Plaintiffs allege that they have been denied the right to pray outide of their cells.

*That they have been denied the right to pray in the Mosque.

*That they are not being provided with meals that meet their religous dietary requirements.

*That the meals that they are being served do not meet adequate nutrtional standards and have not been evaluated by a licensed dietician.

*The Plaintiffs are not being allowed to wear their religous Kufis.

*The Plaintiffs' food is not being prepared seperately

from that of the general population.

*The Plaintiffs' are being forced to consume a vegetarian diet in contradiction to the precepts of their faith,and;

*The Plaintiffs are being denied the right to congregate together for religous study.

Almost all of the rights protected by the First Amendment are governed by the same legal standard, developed in a case called Turner v. Saley, 482 U.S. 78 (1987). The Supreme Court **used** the case to establish a four-part test for First Amendment Claims. Under this test, a law that restricts your rights of freedom is permissible as long as it is reasonably related to a legitimate penological interest; i.e. it must meet the four-part test to be considered a legitimate penological interest. If the prison officials fail to fulfill any of those four parts, then the restriction will not be upheld.

The **Turner Factor** involves the following four-part test:

1. Whether there is a logical connection between the restriction and the governmental interests invoked to justify it;

2. The availability of alternative means to exercise the restricted right;

3. The impact that accomidation of the right might have on other inmates, on prison personnel, and on allocation of prison resources generally; and

4. Whether there are obvious, easy alternatives to the policy that could be adopted at de minimis cost.

Courts have held that prison officials who argue that a prison rule or practice should be upheld as reasonably related to legitimate penological objectives must submit evidence to that effect, and not just argument. Walker v. Summer, 917 F.2d

382, 386-387(6th Cir. 1990); Hunafa v. Murphy, 907 F.2d 46, 48 ( 7th Cir. 1990); Swift v. Lewis, 901 F.2d 730, 731-732 (9th Cir. 1990); Pressley v. Brown, 764 F.Supp. 112, 117 (W.D. Mich. 1990).

In the instant case, the Defendants have not made any showing by way of evidence, or anything past mere conjecture, that the restrictions they have placed on the Plaintiffs' free exercise of religon are in any way related to legitimate penological interests. Nor have they made any showing that any claim they make can in anyway hold up to the Four-part test in Turner.

It is obligatory in the Plaintiffs' religon to eat Halal meat. Turner applies to special diets. DeHart v. Horn, 227 F.3d 47 (3rd Cir. 2000).

In the instant case, under the first part of the Turner test, the Defendants' have failed to make a showing that their restriction of plaintiffs' rights are in any way related to a legitimate penological interest.

Under the second prong, Defendants' have failed to show that there are alternative means available for the Plaintiffs' to exercise their rights. The Defendants' have attempted to provide the Plaintiffs' with a "protein alternantive", however, this is not in conformance with the Plaintiffs' religous beliefs. We are not vegetarians, and it is obligatory for us to consume halal meat, as is evidenced in the complaint. Even if we somehow could consume the "protein alternative" that the Defendants' were ordered to provide the Muslim population, the Defendants' don't even provide that, except on very rare occasions.

Under the third part of the test, Defendants' have failed to make an evidentiary showing that the accomidation of the Plaintiffs' right will have a severe effect on prison resources in general. In fact, providing Muslim inmates with Halal meat is less expensive than it is to provide Jewish inmates with kosher meals, yet Jewish inmates receive kosher meals. Furthermore, members of the Muslim community outside of the institution have even offered to deliver the Plaintiffs' food to the institution, further eliminating any concerns that the Defendants' may have as to cost.

Finally, in conjunction with the third part of the test, we find the fourt part of Turner is fulfilled as well. Given that it is less expensive to provide Muslim inmates with halal meat, this makes it a more sound and cost effective altern-ative, fulfilling the fourth part of the Turner test.

Even if the Defendants' could make a showing that their restriction of the plaintiffs' rights is valid under any of the four parts of this test, it would still be necessary for them to show by means of evidence, that they can fulfill all four parts of the Turner test, and not just a single prong, before such a resticiton will be upheld. Consequently, the Defendants' have failed to do such.

The next major restriction the Defendants' have sought to impose on the Plaintiffs' comes in the form of restricting their ability to pray outside of their cells, whether alone or in con-gregation. Again, in this instance, the Defendants' have failed to make an evidentiary showing that such a restriction is related to a legitimate penological interest, and instead have relied upon nothing but conjecture to support their claims.

As mentioned earler in this motion, since the history of this institution began, the Muslim inmate population has always been allowed to pray individually outside of their cells, or likewise in congregation with other Muslims. There was never any security issue raised when four or five Muslims got together and prayed a brief five minute prayer, or when they got together in the library to study their faith.

The Defendants' seem to assert that the Muslims gathering together presents a security risk. However they fail to mention that all other griops of people within this institution are allowed to group together and conduct their activities. Other inmates are provided with baseball bats (aluminum), and gather together in groups of twenty or more and recreate. Other groups gather together in eight or more and gamble. Yet another group is allowed to gather in sometimes ten or more and practice witch-craft! All this on a daily basis.

What is the difference with four Muslims sitting together at a table and reading a book, compared to any other four persons sitting together and reading a book? How can we be denied the right to congregate, but yet no other groups are? In this case, the Muslims are the only group being singled out and labeled as a security concern. All other groups are allowed to do exactly the same things that Muslims do, but yet they are not labeled a security risk, and Muslims are.

The Defendants', in their motion to dismiss, have tried to make it seem as though the Defendants are acting in the neutral interests of security and orderly operation of the facility, but they fail to mention that any other non-Muslim

group is allowed to do the very same things that the Muslims do, but yet they are not told to stop or considered a security risk.

Coming to the last of the Plaintiffs' major claims in their complaint, the denial of the Defendants in allowing the Plaintiffs' to wear their religous Kufi, we find that this too does not hold up to the standard of Turner. Likewise, the Defendants' have offered no evidence that this would in any way pose a security concern, or that the Defendants' restriction is in any way related to a legitimate penological interest. As mentioned earlier, while all other religous groups are allowed to wear their religous decorum, the Muslims are the only group who are not.

As mentioned earlier in this complaint, the Supreme Court has ruled in the case of Cruz v. Beto, id., that every prisoner is entitled to a reasonable opportunity of pursuing his faith comparable to to the opportunity afforded fellow prsioners who adhere to conventional religous precepts. As evidenced in this comlaint, declaration, and facts stated herein, the Defendants have clearly not afforded the same treatment to the Sunni Muslim poplution as they have any other group. The very things that are being denied to the Sunni Muslims is being granted and allowed to all other groups. Based upon the evidence, a prima faice showing has been made by the Plaintiffs supporting their claim of a violation of the equal protection of the laws. Any evidentiary defects or inability on the part of the Plainitffs to adequately state a claim upon which relief can be granted, or to adequately establish the facts, is appropriately remedied by the attached declaration and the facts mentioned herein.

**GROUNDS FOR INJUNCTIVE RELIEF**

A suit against a government official in his or her official capacity is the same as a suit "against [the] entity of which [the] officer is an agent." Monell v. New York City Department of Social Services, 436 U.S. 658, 690 n. 55.(1978).

Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, "the entity's 'policy of custom' must have played a part in the violation of a federal law. For the same reasons, the only immunities available to the defendant in an official-capacity action are those that the governmental entity posesses. Hafer v. Melo, 502 U.S. 21, 25 (1991).

When a State official is sued in his official capacity, the plaintiff is limited to equitable (injunctive) relief. Will v. Michigan Department of State Police, 491 U.S. 58, 71 n. 10 (1989). See also, Ex Parte Young, 209 U.S. 123, 159-160 (1908).

Even if the Plaintiffs' failed to link any factual predicate to each of the named Defendants for each of the constitutional violations named in the complaint, it still does not absolve the **Defendants** from their liability for injunctive relief. Each of the named Defendants are not only sued in their individual capacities, but they are also being sued in their offical capacities, because they are the parties who have the ability to end the constitutional violations if injuctive relief is granted by the court and they are so ordered.

**CONCLUSION**

The Pro se complaint must be held to less stringent standards as a matter of law. Conley v. Gibson, id., and Haines v. Kerner, id.. For the foregoing reasons, the Rule 12(b)(6) Motion to Dismiss filed by the Defendants, Ashbel T. Wall, James Weeden, Matthew Kettle, Roberta Richman, and John Rogers should be denied;Plaintiffs' Complaint by Juan Evora, Corey Day, Omar Austin, James Barnes, Tracy Barros, **Dandridge** Catus, Alvin Smith, Marvin Rubio, James Hundley, Gary Gromkievicz, Carlos Ocasio, Shea Cooke, Terry Griffin, and Simeon Briggs should proceed for further action.

Respectfully Submitted,

Corey A. Day, et al.
P.O. Box 8273
Cranston, RI 02920

Date: 8/29/08

Certification of Service

I, Corey A. Day, hereby declare under the penalty of perjury pursuant to 28 USCA 1746, that I mailed a true copy of this motion, declaration, and all other documents to the Defendants' attorney, Michael B. Grant, Esq., located at 40 Howard Avenue, Cranston, RI 02920.

8/29/08